IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                          Plaintiff,<br><br>v.<br><br>RONALD DARNELL BROWN, JR.,<br><br>                          Defendant. | **MEMORANDUM DECISION AND ORDER DENYING DEFENDANT'S MOTION TO DISMISS INDICTMENT**<br><br>Case No. 2:22-cr-00239-JNP-CMR<br><br>District Judge Jill N. Parrish<br><br>Magistrate Judge Cecilia M. Romero |

"[T]o declare an Act of Congress Unconstitutional . . . is the gravest and most delicate duty that [a c]ourt is called on to perform." *Blodgett v. Holden,* 275 U.S. 142, 147-48 (1927) (Holmes, J., concurring). With the present motion, Ronald Darnell Brown, Jr. ("Brown") asks the court to embark down this road by overturning a federal statute regulating the possession of firearms by alleged domestic abusers as a violation of the Second Amendment. The court ultimately declines to accept this invitation.

In May of 2021, a civil protective order was entered against Brown by one of his former romantic partners after he purportedly hit her face and took her phone during an argument. Nearly a year later, Brown was arrested while carrying a Glock 19 9mm semi-automatic pistol. The Government subsequently charged him with violating 18 U.S.C. § 922(g)(8), a statute criminalizing the possession of a firearm while subject to a civil protective order. This charge is awaiting trial before the court.

Brown now moves to dismiss the indictment against him on grounds that § 922(g)(8) is facially unconstitutional because it infringes upon his Second Amendment rights. Defendant

recognizes that the Tenth Circuit long ago decided that § 922(g)(8) is constitutional in *United States v. Reese*, 627 F.3d 792, 804 n.4 (10th Cir. 2012). But Brown argues that it is time to revisit this holding in light of *New York State Rifle & Pistol Assoc. v. Bruen*, 597 U.S. ___, 142 S.Ct. 2111 (2022), a recent U.S. Supreme Court decision broadening gun rights, and *United States v. Rahimi*, 61 F.4th 443 (5th Cir. 2023), *cert. granted*, 2023 WL 4278450 (U.S. June 30, 2023) (No. 22-915), a Fifth Circuit interpretation of *Bruen* holding § 922(g)(8) unconstitutional. Defendant was right to suspect that the constitutionality of § 922(g)(8) is an open question of law. Soon after Brown filed this motion, the Supreme Court issued a writ of certiorari in *Rahimi*. 2023 WL 4278450.

That the Supreme Court will review the constitutionality of § 922(g)(8) within the coming year does not obviate the need for this court to issue a decision in the present matter. The parties agree that justice is best served with a speedy resolution of Brown's case rather than by waiting until the Supreme Court's ruling next summer. For the reasons articulated below, the court DENIES Brown's motion to dismiss and declines to hold § 922(g)(8) facially unconstitutional.

## FACTUAL BACKGROUND

On June 29, 2022, the United States charged Brown with one count of violating § 922(g)(8). ECF No. 1. § 922(g)(8) provides that,

> [i]t shall be unlawful for any person . . . who is subject to a court order that[:] (A) was issued after a hearing of which such person received actual notice, and at which such person had an opportunity to participate; (B) restrains such person from harassing, stalking, or threatening an intimate partner of such person or child of such intimate partner or person, or engaging in other conduct that would place an intimate partner in reasonable fear of bodily injury to the partner or child; and (C)(i) includes a finding that such person represents a credible threat to the physical safety of such intimate partner or child; or (ii) by its terms explicitly prohibits the use, attempted use, or threatened use of physical force against such intimate partner or child that would reasonably be expected to cause bodily injury . . . to . . . possess in or affecting commerce, any firearm or ammunition.

The Government's indictment alleges that Brown possessed a Glock 19 9mm semi-automatic pistol and corresponding ammunition though he was subject to a protective order. ECF No. 1.

The protective order from which this case arises stems from an April 22, 2021 request for a civil protective order against the Defendant by one of Brown's former romantic partners. ECF No. 47 at 2. In her request for a protective order, Brown's former partner alleged that he hit her face and attempted to take her phone during an argument. *Id*. An initial hearing on the petition for a protective order was held on May 6, 2021. *Id*. Following this hearing, a court entered a protective order and it was served upon Brown. *Id*. On May 21, 2021, a second hearing took place to consider a modified protective order. *Id*. At the hearing, the modified order was entered and served upon the Defendant. *Id*. This new order restrained Brown "from harassing, stalking, or threatening an intimate partner, and by its terms explicitly prohibited the use, attempted use, or threatened use of physical force against such intimate partner that would reasonably be expected to cause bodily injury. . . ." ECF No. 1. Page one of the May 21 order declares "No guns or firearms!" with a citation to § 922(g)(8). ECF No. 47 at 3. Brown received notice of and was present at both hearings. *Id*. at 2. Both parties were also represented by counsel at each hearing. *Id*.

On April 14, 2023, Defendant moved to dismiss the indictment on constitutional grounds. ECF No. 44. The Government filed a memorandum in opposition to this motion on May 1, 2023, ECF No. 47, and Defendant replied on May 8, 2023, ECF No. 49. On July 21, 2023, the Government submitted a supplemental memorandum in opposition without leave from the court. ECF No. 58. The parties argued the motion at hearing on July 25, 2023.

## LEGAL BACKGROUND

The Second Amendment to the U.S. Constitution states that "[a] well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." For much of this Nation's history, state and federal courts largely held that this

3

Amendment guaranteed the rights of states to organize militias and of individuals to keep weapons connected to service in these militias. *See* Stephen Kiehl, *In Search of a Standard: Gun Regulations After Heller and McDonald*, 70 Md. L. Rev. 1131, 1134 (2011). But in 2008, the Supreme Court dramatically changed course in *District of Columbia v. Heller*. 554 U.S. 570 (2008). In reversing much of the Second Amendment's existing case law, the Court held that the Constitution protects an individual's right to keep and bear arms for traditionally lawful purposes, such as self-defense. *Id.* at 635.

After *Heller*, and its companion decision *McDonald v. City of Chicago*, courts could no longer treat the Second Amendment as "a second-class right."[1] 561 U.S. 742, 780 (2010). "In the years since, the Courts of Appeals . . . coalesced around a 'two-step' framework for analyzing Second Amendment challenges that combine[d] history with means-end scrutiny." *Bruen*, 142 S. Ct. at 2117. At the first step of the emergent *Heller-McDonald* test, the Government had to justify its regulation by "establish[ing] that the challenged law regulate[d] activity falling outside the scope of the right as originally understood." *Id*. at 2126 (quoting *Kanter v. Barr*, 919 F. 3d 437, 441 (7th Cir. 2019)). From there, courts were required to "ascertain the original scope of the right based on its historical meaning." *Id.* (citing *United States v. Focia*, 869 F. 3d 1269, 1285 (11th Cir. 2017)). If the Government could prove that the regulated conduct was outside the scope of the right as originally understood, then the regulated activity was categorically unprotected. *Id*. But if not, and "historical evidence at this step [wa]s 'inconclusive or suggest[ed] that the regulated activity [wa]s not categorically unprotected,' the courts generally proceed[ed] to step two." *Id*. (quoting *Kanter*, 919 F. 3d, at 441).

---

[1] *McDonald* held that the Second Amendment applied to the states because it was incorporated by the Fourteenth Amendment's Due Process Clause. *McDonald*, 561 U.S. at 750.

At the second step, courts employed a "means-ends" analysis by examining "how close the law [came] to the core of the Second Amendment right and the severity of the law's burden on that right." *Id*. Generally, the core of the Second Amendment was viewed as "limited to self-defense in the home." *Id*. (quoting *Gould v. Morgan*, 907 F. 3d 659, 671 (1st Cir. 2018). If the law burdened this core right, courts applied strict scrutiny, asking whether it was narrowly tailored to a compelling governmental interest. *Id*. If the law did not implicate the core of the Second Amendment, courts applied intermediate scrutiny and considered whether the regulation was substantially related to the achievement of an important governmental interest. *Id*.

Under the *Heller* framework, courts across the country seemingly agreed that § 922(g)(8) easily withstood constitutional muster. *See, e.g.*, *United States v. Bena*, 664 F.3d 1180, 1183 (8th Cir. 2011); *Reese*, 627 F.3d at 804 n.4; *United States v. Chapman*, 666 F.3d 220 (4th Cir. 2012); *United States v. Boyd*, 999 F.3d 171, 188 (3d Cir. 2021), *cert. denied*, 142 S. Ct. 511 (2021). Even the Fifth Circuit, the court that recently struck down § 922(g)(8) in *Rahimi*, held that the statute was constitutional under *Heller*. *See United States v. McGinnis*, 956 F.3d 747 (5th Cir. 2020), *cert. denied*, 141 S. Ct. 1397 (2021). In each instance that parties requested a writ of certiorari from rulings upholding § 922(g)(8), the Supreme Court declined to hear the issue and allowed the statute to stand.

But in 2022, the Supreme Court revisited its prior Second Amendment holdings in *New York State Rifle & Pistol Assoc. v. Bruen*. 142 S. Ct. 2111. Setting its sights on the case law that had been developed by appellate courts since *Heller*, the Court clarified that "[w]hen the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." *Id*. at 2129-30. If a gun control statute is covered by the text of the Amendment, the only way it can survive is if the Government can "justify its regulation by demonstrating that it is

consistent with the Nation's historical tradition of firearm regulation." *Id*. at 2130. Put another way, the Court expressly overruled the means-end test for firearm regulations—the second step of the *Heller* test—in favor of a test centered on the text of the Constitution and analysis of historic analogues. No longer were courts to weigh the merits of a regulation against the gun rights of the American people. Instead, "[o]nly if a firearm regulation is consistent with this Nation's historical tradition [could] a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.'" *Id*. (quoting *Konigsberg v. State Bar of Cal.*, 366 U. S. 36, 50, n.10 (1961)).

In *Bruen*, the Supreme Court applied its new text and tradition test to a New York public carry licensing regime that allowed issuance of a permit only upon a showing of "special need" rather than on the basis of "objective criteria."[2] *Id*. at 2122. First, applying the text of the Second Amendment to the licensing system, the Court had "little difficulty concluding" that the Amendment's text covered the New York regulation. *Id*. at 2134. In particular, it found that petitioners, "two ordinary, law-abiding, adult citizens," were "part of 'the people' whom the Second Amendment protects." *Id*. (citing *Heller*, 554 U. S. at 580). The Court also determined that "handguns [we]re weapons 'in common use' today for self-defense." *Id*. Finally, it found that the text of the Second Amendment made no "home/public distinction with respect to the right to keep and bear arms." *Id*.

After determining that the text of the Second Amendment was clearly applicable to the New York licensing regime, the Court turned to the question of whether the regulation could retain

---

[2] In much of the country, there is a presumption that an individual may obtain a license to carry a firearm in public so long as he is not disqualified pursuant to a list of enumerated criteria. *Bruen*, 142 S. Ct. at 2122. But the New York licensing regime presumed that individuals were not qualified to carry a firearm in public unless they could convince an official that they met subjective need-based criteria. *Id*.

constitutional muster through its accord with the historical tradition of American firearm regulation. *Id*. at 2135. To meet its burden to show historical continuity, the Government offered up several historical analogues demonstrating that a tradition of limiting public carry in areas frequented by the general public has long existed in this Nation. These examples included regulations from "(1) medieval to early modern England; (2) the American Colonies and the early Republic; (3) antebellum America; (4) Reconstruction; and (5) the late-19th and early-20th centuries." *Id*. at 2135-36. Despite the many possible analogues presented by the Government, the Court ultimately found that New York's permitting rules did not fit within America's tradition of regulation. *Id*. at 2156. As such, the Court held that the regime was unconstitutional. *Id*.

Shortly after the *Bruen* decision, lower courts began applying the case's test to challenged firearm regulations. One such challenge arose from Zackey Rahimi's violation of § 922(g)(8) in Texas. *Rahimi*, 61 F.4th at 449. Upon pleading guilty to possessing a rifle and pistol though he was subject to a civil protective order, Rahimi appealed to the Fifth Circuit, arguing that § 922(g)(8) is facially unconstitutional.[3] *Id*. The court agreed and vacated Rahimi's conviction. *Id*. at 461. After first noting that the Fifth Circuit had recently ruled that § 922(g)(8) was constitutional under the *Heller* framework, the panel nevertheless determined that it was required to revisit this prior ruling due to the recent *Bruen* decision. *Id*. at 450-51. In applying the first step of the *Bruen* test, the court found that the plain text of the Second Amendment covered the statute at issue. Though Rahimi was subject to a civil protective order, he was still a member of "the people" whose right to bear arms is presumptively protected by the text of the Second Amendment. *Id*. at 453.

---

[3] The court recognizes that this is a somewhat simplified telling of the procedural posture in *Rahimi*. *See* 61 F.4th at 459.

Next, the court applied the second step of the test, finding that § 922(g)(8) fell outside "the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id*. at 454 (quoting *Bruen*, 142 S. Ct. at 2127). The Fifth Circuit reached this conclusion after reviewing several possible historical analogues for § 922(g)(8) presented by the Government. These potentially similar regulations included (1) laws that stripped "dangerous" individuals of their arms, (2) laws that prevented individuals from "going armed," (3) and laws that allowed individuals to demand "surety" from those they had just cause to fear. *Id*. at 456. Because the court found that the Government failed to show these regulations were analogous to the statute at issue, it held that § 922(g)(8) was unconstitutional. *Id*. at 461.

The Fifth Circuit's reasoning in Rahimi has not been universally praised by district courts. For instance, two judges in the Western District of Oklahoma delivered decisions upholding § 922(g)(8). *See United States v. Kays*, 624 F. Supp. 3d 1262 (W.D. Okla. Aug. 29, 2022) (ECF No. 47-1); *United States v. James*, No. CR-22-154-J, slip. op. (W.D. Okla. Mar. 20, 2023) (ECF No. 47-2). In the District of Utah, Judge Sam recently issued a brief order ruling the same way. *United States v. Gordon*, 2:22-CR-00308-DS, slip op. (D. Utah Jun. 21, 2023). And the Tenth Circuit also signaled that it is somewhat skeptical of arguments against § 922(g)(8)'s constitutionality by favorably citing to the *Kays* decision. *United States v. Haas*, No. 22-5054, 2022 WL 15048667, at *2 n.1 (10th Cir. Oct. 27, 2022). Possibly sensing that the issue of § 922(g)(8)'s constitutionality is not likely to garner a consensus among the Nation's appellate courts, the Supreme Court granted certiorari in *Rahimi* on June 30, 2023. 61 F.4th 443, *cert. granted*, 2023 WL 4278450 (U.S. June 30, 2023) (No. 22-915). Though each party in the present matter is aware that the Supreme Court will hear argument on *Rahimi* sometime in the coming year, at a status conference on July 5, 2023,

both indicated that they do not wish to wait for the Supreme Court's decision before this court issues a ruling on Brown's motion.

## LEGAL STANDARD

"The Federal Rules of Criminal Procedure encourage the pretrial resolution of a number of important, and even some potentially dispositive, matters." *United States v. Pope*, 613 F.3d 1255, 1258 (10th Cir. 2010). Under Rule 12(b)(3), a defendant may challenge an indictment before trial when a "trial of the facts surrounding the commission of the alleged offense would be of no assistance in determining the validity of the defense." *Id.* at 1259 (citations omitted). Because Brown advances only a facial challenge to § 922(g)(8), the court may properly decide his motion as a matter of law.

## ANALYSIS

According to the Supreme Court's decision in *Bruen*,

> when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. To justify its regulation, the government may not simply posit that the regulation promotes an important interest. Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation. Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command."

142 S. Ct. at 2126 (citation omitted) (footnote omitted). The court must apply this framework to the facially challenged statute in two parts. It first analyzes whether the plain text of the Second Amendment covers the individual conduct implicated by § 922(g)(8). It then examines whether § 922(g)(8) is consistent with the United States' historical tradition of firearm regulation.

## I.   § 922(G)(8) REGULATES CONDUCT PROTECTED BY THE PLAIN TEXT OF THE SECOND AMENDMENT

*Bruen* held that the Second Amendment unambiguously "protect[s] the right of an *ordinary, law-abiding* citizen to possess a handgun . . . for self-defense." *Bruen*, 142 S. Ct. at 2122

(emphasis added). In *Heller*, the Court likewise specified that the Second Amendment merely protects the rights of "law-abiding, responsible citizens." *Heller*, 554 U.S. at 635. Based on this language, the Government argues that § 922(g)(8) is facially constitutional at step-one of the *Bruen* test because individuals subject to a protective order are not the "ordinary," "law-abiding," or "responsible" citizens whose rights the plain text of the Second Amendment, as interpreted by *Heller* and *Bruen*, are meant to protect. The court does not agree with this reading of the Constitution. Instead, it finds that the *text* of the Second Amendment does not strip the right to bear arms from individuals subject to a civil protective order.

At step-one, courts begin with the written words of the Second Amendment. *Bruen*, 142 S. Ct. at 2126. The Amendment states that "[a] well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." While the phrasing of the Amendment is grammatically tricky, the Supreme Court has made it clear that the class of individuals the text protects is "the people." *Heller*, 554 U.S. at 579. Thus, to decide whether an individual subject to a protective order has a right to possess a firearm that is protected by the Second Amendment, the court must resolve whether such an individual is part of "the people."

Appellate courts have defined "the people" narrowly and broadly, but the Tenth Circuit has yet to weigh in on the issue.[4] *See, e.g.*, *United States v. Bena*, 664 F.3d 1180, 1184 (8th Cir. 2011)

_____

[4] Several district courts in the Tenth Circuit have addressed this issue. Most have sided with Brown. *See, e.g.*, *United States v. Carrero*, No. 2:22-CR-00030, 2022 WL 9348792, at *2 (D. Utah Oct. 14, 2022) (quoting *United States v. Coombes*, No. 22-CR-00189, 2022 WL 4367056, at *4 (N.D. Okla. Sept. 21, 2022)) ("This court declines to read 'the people' so narrowly. Instead, it follows courts from within the Tenth Circuit, which have observed that 'convicted felons fall within 'the people' as contemplated by the First and Fourth Amendments.'"); *Kays*, 624 F. Supp. 3d at 1265 ("This Court declines to read into *Bruen* a qualification that Second Amendment rights belong only to individuals who have not been accused of violating any laws."); *United States v. Gray*, No. 22-CR-00247-CNS, 2022 WL 16855696, at *2 (D. Colo. Nov. 10, 2022) ("The Court adopts the

(defining "the people" narrowly); *Rahimi*, 61 F.4th at 453 (defining "the people" broadly). As a result, the court relies primarily on the words of the Supreme Court's gun cases and the Constitution itself to resolve whether those with active restraining orders fall into this class. *Heller* explained that the Second Amendment's invocation of "the people" "unambiguously refers to all members of the political community, not an unspecified subset." 554 U.S. at 580. Membership in the "political community" is granted to those who are "part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community." *Id*. (citing *United States v. Verdugo–Urquidez*, 494 U.S. 259, 265 (1990)). With this recognition, the *Heller* Court held that there is a "strong presumption" that rights guaranteed under the Second Amendment, like those guaranteed by other Amendments, are "exercised individually and belong[] to all Americans." *Id*. at 581.

But even with this strong presumption, the Government questions whether Brown really is a member of the political community. It argues that *Bruen* and *Heller* implicitly recognized that there are limits to the scope of the Second Amendment since the cases repeatedly stated how the Second Amendment guarantees the rights of "law-abiding" citizens (*Bruen* adds "ordinary," and *Heller* adds "responsible" as modifiers). *Bruen*, 142 S. Ct. at 2122; *Heller*, 554 U.S. at 579. Indeed, according to the Government, *Bruen* and its concurring opinions used the term "law-abiding" at least fourteen times. *Bruen*, 142 S. Ct. at 2122, 2125, 2131, 2133, 2134, 2138, 2150, 2156, 2157,

---

analysis of its sister district courts within the Tenth Circuit and finds that Defendant is covered by the Second Amendment's plain text."); *United States v. Harrison*, No. CR-22-00328-PRW, 2023 WL 1771138, at *4 (W.D. Okla. Feb. 3, 2023) (declining to hold that marijuana users are not part of "the people"). But at least one took a position that aligns more closely with that taken by the Government. *See United States v. Gonzalez*, No. 1:22-CR-00054, 2022 WL 17583769, at *2 (D. Utah Dec. 12, 2022) ("[Defendant's] initial assumption that he is part of 'the people' who are protected by the Second Amendment is faulty. As the government points out, '[t]o presume that the Second Amendment provides blanket protection in any case involving a firearm regulation is contrary to the Court's holding in *Bruen*.'").

2158, 2159, 2161. Presumably, the Government means to suggest that individuals who are not "law-abiding" lay outside the political community. But a careful review of these opinions reveals that the Supreme Court's references to limitations on the Second Amendment's reach were not intended to define law breakers out of the "political community." Instead, *Bruen* and *Heller* seem to use the "law-abiding" and "responsible/ordinary" language to explain that the Court did not intend to undermine the most serious and "*longstanding* prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings . . . ." *Heller*, 554 U.S. at 626-27 (emphasis added). This passage indicates that it is most appropriate to interpret the Court's "law-abiding" language as a product of the "history prong" of the *Heller-Bruen* test. Indeed, the Court never cites any textual basis for limiting the right to bear arms to "law-abiding" citizens. On this reading, while a law restricting the gun rights of felons would be presumptively unconstitutional after the first step of the test, at step-two the Government could meet its burden by showing that the law was in accord with the Nation's tradition of firearm regulation.

The court is also skeptical of the Government's interpretation of *Heller* and *Bruen* because it turns "the typical way of conceptualizing constitutional rights on its head." *Rahimi*, 61 F.4th at 453. As noted in an oft-cited dissent by then-Judge Barrett prior to her appointment to the Supreme Court, under an interpretation of the Second Amendment narrowly defining "the people," an individual could hold rights one day and lose them the next. "[T]he moment he was convicted of a violent crime or suffered the onset of mental illness, his rights would be stripped as a self-executing consequence of his new status." *Kanter*, 919 F.3d at 452 (Barrett, J., dissenting). This is a strange way of looking at Constitutional rights. As Justice Barrett explains:

> In other contexts that involve the loss of a right, the deprivation occurs because of state action, and state action determines the scope of the loss. Felon voting rights

> are a good example: a state can disenfranchise felons, but if it refrains from doing so, their voting rights remain constitutionally protected. So too with the right to keep and bear arms: a state can disarm certain people (for example, those convicted of crimes of domestic violence), but if it refrains from doing so, their rights remain constitutionally protected. In other words, a person convicted of a qualifying crime does not automatically lose his right to keep and bear arms but instead becomes eligible to lose it.

*Id*. Applying this view to the present case, Brown did not *automatically* lose his constitutional right to bear arms simply because he posed a danger of future domestic abuse. According to then-Judge Barrett, it would take an act of a legislature, § 922(g)(8) here, to affirmatively effectuate this deprivation. Thus, it is not the text of the Second Amendment that strips Brown's rights away, but rather a statute that is blessed by the unwritten portion of the Amendment examined in step-two of the *Bruen* test. Because the Second Amendment "is not a second class right," the court finds merit in Justice Barrett's view that "the people" must be defined broadly to protect rights that are not limited by affirmative legislative acts. *McDonald*, 561 U.S. at 780. Thus, while a civil proceeding found that Brown posed a danger to others, he is nonetheless part of "the people" and textually entitled to the Second Amendment's guarantees.[5]

---

[5] The Government also attempts to use *Bruen's* endorsement of the "shall-issue" licensing provisions that exist in forty-three states as further evidence that individuals subject to § 922(g)(8) do not enjoy Second Amendment rights. Several of the "shall-issue" states specifically exclude individuals subject to protective orders from possessing firearms. *See, e.g.*, Utah Code Ann. § 76-10-523(3)(b) and § 76-10-503(1)(b)(xi). According to the Government, the Supreme Court implicitly endorsed the constitutionality of protective order provisions when it stated that "shall-issue" statutes were generally not repugnant to the Second Amendment. *See Bruen*, 142 S. Ct. at 2138 n.9. It is a step too far to assert that the *Bruen* Court's blessing was meant as approval of the specific contours of each "shall-issue" licensing regime. In fact, the Court warned litigants that it was open to constitutional challenges to certain provisions contained in "shall-issue" licensing regimes. *Id*. Ultimately, the material issues before this court regarding § 922(g)(8) were simply not decided by the Supreme Court in *Bruen*.

## II. § 922(G)(8) IS CONSISTENT WITH THE NATION'S HISTORICAL TRADITION OF FIREARM REGULATION

Since the Second Amendment's plain text protects the conduct barred by § 922(g)(8), the burden shifts to the Government to overcome the presumption that § 922(g)(8) is unconstitutional. *Bruen*, 142 S. Ct. at 2129-30. To successfully defend its regulation, the Government must now demonstrate "that it is consistent with the Nation's historical tradition of firearm regulation." *Id.* at 2130. "Only then may [the] court conclude that [Brown's] conduct falls outside the Second Amendment's unqualified command." *Id.* (internal quotation marks omitted).

The Government can meet its burden by pointing to "historical precedent from before, during, and even after the founding [that] evinces a comparable tradition of regulation." *Id.* at 2131-32 (internal quotation marks omitted). As *Bruen* explains, "[h]istorical analysis can be difficult; it sometimes requires resolving threshold questions, and making nuanced judgments about which evidence to consult and how to interpret it."[6] *Id.* at 2130 (quoting *McDonald*, 561 U.S. at 803-04 (Scalia, J., concurring)). But the court is "not obliged to sift the historical materials for evidence to sustain [§ 922(g)(8)]. That is [the Government's] burden." *Id.* at 2150.

For this court to uphold § 922(g)(8), the Government need not provide evidence of a regulation that is a "historical twin." *Id.* at 2133. Rather, evidence of a "well-established and representative historical analogue" suffices. *Id.* "Even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster." *Id.*

---

[6] Due to this difficulty, at least one district court has suggested that parties submit expert reports from historians to assist judges in gun regulation cases requiring the use of history. *United States v. Bullock*, No. 3:18-CR-165-CWR-FKB, 2023 WL 4232309, at *4-5 (S.D. Miss. June 28, 2023). This same court also criticized the Supreme Court for compelling district courts to operate outside their area of expertise—interpreting the law—by performing "law office" history. *Id.* at *25-26; *see* David T. Hardy, *Lawyers, Historians and 'Law Office History'*, 46 Cumberland L. Rev. 1 (2015).

This is because "the Constitution can, and must, apply to circumstances beyond those the Founders specifically anticipated." *Id*. at 2132. "To be clear, analogical reasoning under the Second Amendment is neither a regulatory straitjacket nor a regulatory blank check." *Id*. at 2133.

While *Bruen* did not "provide an exhaustive survey of the features that render regulations relevantly similar under the Second Amendment," it did direct judges to examine two metrics in their analysis: "*how* and *why* the regulations burden a law-abiding citizen's right to armed self-defense." *Id*. at 2132-33. (emphasis added). The Court also stressed that "whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified are 'central' considerations when engaging in an analogical inquiry." *Id*. at 2133 (citing *McDonald*, 561 U. S., at 767) (cleaned up). *Bruen* did note, however, that "[i]n some cases, [the historical] inquiry will be fairly straightforward." *Id*. at 2131. It provided examples of three such cases:

> [W]hen a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment. Likewise, if earlier generations addressed the societal problem, but did so through materially different means, that also could be evidence that a modern regulation is unconstitutional. And if some jurisdictions actually attempted to enact analogous regulations during this timeframe, but those proposals were rejected on constitutional grounds, that rejection surely would provide some probative evidence of unconstitutionality.

*Id*. As an initial matter, this court will have to determine whether any of these "straightforward" scenarios apply to Brown's challenge of § 922(g)(8). If none fit, the court will examine each of the potential historic analogies offered by the Government to determine if the challenged statute is in line with this Nation's historical tradition of firearm regulation.

## A.  THE SOCIAL PROBLEM ADDRESSED BY § 922(G)(8) IS A RECENT PRIORITY

Brown argues that the court need not dive deeply into a review of historical analogues to § 922(g)(8) because this motion only requires a "straightforward" analysis of the statute's historic

precedents. To support this contention, he asserts that domestic violence, the problem addressed by § 922(g)(8), has persisted as a general social problem since the eighteenth-century, yet early Americans never enacted "distinctly similar historical regulation addressing that problem." *Id*. While it is undoubtedly true that Americans have engaged in domestic abuse from this Nation's very origins, we did not consider this ugly aspect of our society a "problem" to be solved until somewhat recently.

The legal history of domestic abuse in the United States is dark and troubled.[7] At the time of the founding and long after, many states not only turned a blind eye to violence against women, but explicitly sanctioned it. Through much of the nineteenth century, the common law recognized the "right of chastisement," which permitted "husbands to inflict corporal punishment on their wives." Joseph Blocher, *Domestic Violence and the Home-Centric Second Amendment*, 27 Duke J. of Gender L. & Pol'y 45, 56 (2020) (citation omitted); Reva B. Siegel, *"The Rule of Love": Wife Beating as Prerogative and Privacy*, 105 Yale L.J. 2117, 2121-41 (1996)). Blackstone's commentaries also recognized such a right, stating that "[f]or, as he is to answer for her misbehavior, the law thought it reasonable to intrust him with this power of restraining her, by domestic chastisement, in the same moderation that a man is allowed to correct his apprentices or children." 1 William Blackstone, Commentaries *444. Even through Reconstruction, states often sanctioned violence against women because they considered the home a place of privacy where

---

[7] *See United States v. Jackson*, No. CR-22-59-D, 2022 WL 3582504, at *3 (W.D. Okla. Aug. 19, 2022) ("Legal scholars have commented on the paucity of evidence that American traditions reached within the home to interfere with domestic relationships, particularly the marital relationship.") (citing Joseph Blocher, *Domestic Violence and the Home-Centric Second Amendment*, 27 Duke J. Gender L. & Pol'y 45, 55-56 (2020) ("In the context of domestic violence prohibitions, the historical record is problematic to say the least.")).

the law should not intervene.[8] For instance, in 1868, the North Carolina Supreme Court decided that, while there is no right to abuse one's spouse, the State could not hold a spouse responsible for this form of violence because "[f]or, however great are the evils of ill temper, quarrels, and even personal conflicts inflicting only temporary pain, they are not comparable with the evils which would result from raising the curtain, and exposing to public curiosity and criticism, the nursery and the bed chamber." *State v. Rhodes*, 61 N.C. 453, 457 (1868).

Given this history, the court cannot find that the Founders and nineteenth-century Americans considered domestic violence a "general societal problem."[9] *Bruen*, 142 S. Ct. at 2131. The problems acknowledged by the Founding generation and those faced by the current generation are different. Therefore, the court must reason by analogy to determine whether § 922(g)(8) fits into this Nation's traditions. *Id*. at 2132.

### B.  THERE ARE HISTORICAL ANALOGUES FOR § 922(G)(8)

The Government argues that three categories of early American laws are similar enough to § 922(g)(8) to warrant a denial of Brown's motion to dismiss. The court examines each group of

---

[8] Siegel at 2120 ("[D]uring the Reconstruction Era, chastisement law was supplanted by a new body of marital violence policies that were premised on a variety of gender-, race-, and class-based assumptions. This new body of common law differed from chastisement doctrine, both in rule structure and rhetoric. Judges no longer insisted that a husband had the legal prerogative to beat his wife; instead, they often asserted that the legal system should not interfere in cases of wife beating, in order to protect the privacy of the marriage relationship and to promote domestic harmony.").

[9] The Government argues that the court should not find that § 922(g)(8) is "straightforwardly" non-analogous to historic gun regulations because twenty-first century women are killed with guns in domestic violence incidents at a higher rate than their founding era counterparts, possibly due to the introduction of new firearm technology. *Compare* Randolph Roth, American Homicide 108 (2009) ("Family and intimate homicides were extremely rare" in colonial America), *with* Violence Policy Center, When Men Murder Women: An Analysis of 2018 Homicide Data, 3 & 5 (58% of all women killed by men were killed in an act of domestic violence and, of those women, 56% were killed with firearms). The court need not wade into murky statistics that might reveal whether women were killed at low or high rates during the founding era when it is more than clear that early Americans accepted domestic violence as part of their society.

laws, finding that they do provide analogues to § 922(g)(8) because they restrict firearm possession using similar methods to the present regulation (the "how") and for similar reasons (the "why"). *Id*. at 2132-33.

### 1. Restrictions Based on "Dangerousness"

The Government offers up several examples of limitations on the right to bear arms imposed on those who were deemed a danger to the state or the community. It argues that if there is evidence that early Americans were open to regulating the firearm possession of "dangerous" individuals, § 922(g)(8) is undoubtedly constitutional because it applies only to those who, after a civil hearing, are determined to pose a real threat of committing future domestic abuse.

As its first potential historical analogue, the Government cites England's pre-Revolution tradition of regulating firearm possession by those who pose a danger to the community. In 1662, Charles II enacted the Militia Act, which granted officers of the Crown the power to "seize all arms in the custody or possession of any person" whom they "judge[d] dangerous to the Peace of the Kingdom.'" Militia Act of 1662, 13 & 14 Car. 2, c.3, § 13 (1662). According to at least one historian, this law was the beginning of "a well-practiced tradition of disarming dangerous persons—violent persons and disaffected persons perceived as threatening to the crown." Joseph G.S. Greenlee, *The Historical Justification for Prohibiting Dangerous Persons from Possessing Firearms*, 20 Wyo. L. Rev. 249, 261 (2020). This tradition was supposedly passed down to the nascent American state prior to the American Revolution. *See Heller*, 554 U.S. at 594-96 (discussing the links between English history and American history). If it is true that the Militia Act sparked a tradition of arms confiscation from dangerous individuals, then it may serve as an analogue to § 922(g)(8).

But there is debate over just how long the Militia Act of 1662 remained relevant in England. In *Rahimi*, for instance, the Fifth Circuit argued that the Militia Act was quickly replaced with a

18

far less restrictive gun regulation regime. 61 F.4th at 456. According to the court, the Militia Act was initially promulgated by Charles II to consolidate power and quell potential revolts after the English Civil War and Oliver Cromwell's interregnum. *Id*. (citing J. Malcolm, To Keep and Bear Arms: The Origins of an Anglo-American Right 35-38 (1994)). Disarmament of the English population pursuant to the Act accelerated with much controversy under the Catholic James II after the new king's ascension to the throne in 1685. *Id*.; *see Heller*, 554 U.S. at 593 (noting that the disarmaments "caused Englishmen . . . to be jealous of their arms"). But in 1688, James II was thrown out of power by the Glorious Revolution and the next set of monarchs, William and Mary, quickly enacted the Declaration of Rights, which guaranteed "[t]hat the subjects which are Protestants may have arms for their defence suitable to their Conditions and as allowed by Law." 1 W. & M., ch. 2, § 7, in 3 Eng. Stat. at Large 441. According to the Supreme Court, the Declaration of Rights undermined the Militia Act of 1662 and served as "the predecessor to our Second Amendment." *Heller*, 554 U.S. at 593.

Rahimi asserts that the fact that the Militia Act's expansive scope was limited "defeats any utility of [the Act] as a historical analogue for § 922(g)(8)." 61 F.4th at 456. Yet, the fact remains that the Declaration of Rights *only* protected Protestants. After the Glorious Revolution, in which Protestants once more came to power, "roles were reversed" and "disaffected persons" who were subject to arms seizures now included Tories loyal to James II. Greenlee at 259. Indeed, during the seventeenth and eighteenth centuries the Crown frequently used its authority to bar Catholics from possessing firearms to protect public safety. *Id*. at 259-61. Moreover, at no time during the original debates over the Declaration of Rights did any of the members of the adopting Convention "seek, state, or claim that the disarming of 'dangerous persons' provision in the Militia Act was illegal, arbitrary, or against their alleged fundamental right to 'have arms' for personal defense."

Patrick J. Charles, *"Arms for Their Defence"?: An Historical, Legal, and Textual Analysis of the English Right to Have Arms and Whether the Second Amendment Should Be Incorporated in McDonald v. City of Chicago*, 57 Clev. St. L. Rev. 351, 372-73 (2009). "[D]isarming dangerous persons was supported, as long as did [it] not occur to prominent members of Parliament or the upstanding Protestant gentry." *Id.* In brief, the court finds that there is compelling evidence that the Militia Act of 1662 and its ensuing evolution supports the constitutionality of § 922(g)(8).

Leaving behind England, the Government next argues that in the early United States many colonies and states disarmed groups that these governments believed were untrustworthy or dangerous. *See Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 700 F.3d 185, 200 (5th Cir. 2012); Robert H. Churchill, *Gun Regulation, the Police Power, and the Right to Keep Arms in Early America: The Legal Context of the Second Amendment*, 25 Law & Hist. Rev. 139, 157-60 (2007); Saul Cornell & Nathan DeDino, *A Well Regulated Right: The Early American Origins of Gun Control*, 73 Fordham L. Rev. 487, 506-08 (2004); Joyce Lee Malcolm, To Keep and Bear Arms 140-41 (1994). These early American laws regulating firearm possession by dangerous groups often reached the level of total prohibition. Adam Winkler, *Heller's Catch-22*, 56 UCLA L. Rev. 1551, 1562 (2009).

Although the Government's briefing references the classes disarmed by "dangerousness" laws as "certain persons" who were "untrustworthy" or "dangerous," the court will not use euphemisms to discuss the individuals they targeted. The dangerous groups early colonies and states disarmed included enslaved people, free black individuals, Native Americans, Catholics, and those unwilling to take an oath of allegiance to the state. *See* Churchill at 157-60 (2007); Greenlee at 263; Winkler at 1562. The laws cited by the Government are undoubtedly repugnant to our modern constitutional principles. *Kanter*, 919 F.3d at 458 (Barrett, J., dissenting). This

20

Nation has made great strides in protecting marginalized groups since the founding era. With the ratification of the Fourteenth Amendment and subsequent development of civil rights law, it is now agreed that many of the groups that we once deemed "dangerous" are composed by individuals worthy of equal rights and equal dignity.

Frankly, it is sad commentary on this nation's history that courts must compare laws restraining alleged domestic abusers from retaining firearms to those stripping Second Amendment rights from enslaved people, Native Americans, and religious minorities based on their "dangerous" identity.[10] Yet, at the same time, to understand the principles that animate the Second Amendment, the Supreme Court requires us to look to our grim past to determine the scope of the right to bear arms. Ultimately, laws limiting groups the political community deemed "dangerous" from possessing firearms are strong evidence that this Nation has a historical tradition of limiting the gun rights of those that may pose a threat in the future.[11] Indeed, when one compares §

---

[10] *See* Danny Li, Note, *Antisubordinating the Second Amendment*, 132 Yale L.J. 1821, 1902 (2023) ("In other words, the new controlling historical method of Second Amendment interpretation adopts a subordinating vantage point by granting exclusive authority to arms-related legislative practice at the Founding. It is simply not a form of public justification that displays respect for Black Americans' status as free and equal members of the polity."); *State v. Philpotts*, 194 N.E.3d 371, 373 (Ohio 2022) (Brunner, J., dissenting) ("[N]o such analysis [of the United States' historical tradition of firearm regulation] could account for what the United States' historical tradition of firearm regulation would have been if women and nonwhite people had been able to vote for the representatives who determined these regulations.").

[11] The *Rahimi* panel offers a serious challenge to the use of these statutes by arguing that "these laws fail on substance as analogues to § 922(g)(8), because out of the gate, *why* they disarmed people was different." 61 F.4th at 457. The problem with this contention is two-fold. First, the statutes certainly provide an analogue for *how* § 922(g)(8) regulates. Both § 922(g)(8) and the "dangerousness" statutes allowed seizure of an individual's arm without criminal proceedings. Second, *Rahimi's* argument relies on the level of specificity applied by the court. No doubt the reason for "dangerousness" laws were not to prevent domestic abusers from abusing their partner or child, but if one zooms out, as the Supreme Court allows when the *Bruen* analysis is not "straightforward," both sets of regulations were intended to prevent the future threat of violence arising from a certain class of individuals. *Bruen*, 142 S. Ct. at 2133 (stating that a "dead ringer" is not required). This high-level similarity is sufficient for a finding of constitutionality.

922(g)(8) and early "dangerousness" laws, § 922(g)(8)'s restrictions on allowing potentially dangerous individuals to possess firearms are relatively tame. Unlike the "dangerousness" laws, § 922(g)(8) requires an *individualized* determination of dangerousness during an adversarial civil hearing. § 922(g)(8)(A).

Finally, the Government notes that two less discriminatory proposals during state ratification conventions also indicate that the Founders approved of laws regulating firearm possession that protected the community from specific future danger. In Pennsylvania, a minority coalition at the state constitutional convention authored a report that advocated for an amendment guaranteeing the right to bear arms "unless for crimes committed, or real danger of public injury." *Heller*, 554 U.S. at 604; 2 Bernard Schwartz, The Bill of Rights: A Documentary History 662, 665 (1971). In Massachusetts, Samuel Adams proposed a similar amendment at the state convention recommending "that the said Constitution be never construed to authorize Congress . . . to prevent the people of the United States, *who are peaceable citizens*, from keeping their own arms." 2 Schwarz, The Bill of Rights 675, 681 (emphasis added). Of course, Brown argues that the court should ignore these proposals because they were not adopted by their respective conventions. While it is true that neither proposal made its way into a state constitution, the Court in *Heller* nevertheless insisted that the Pennsylvania proposal was "highly influential,"[12] 554 U.S. at 604, likely because it represented "the view of the Anti-federalists—the folk advocating for very limited federal power, opposing the Constitution generally, but advocating for a strong Bill of Rights." *United States v. Tooley*, 717 F. Supp. 2d 580, 590 (S.D.W. Va. 2010) *aff'd*, 468 F. App'x 357 (4th Cir. 2012). The point is that even advocates of "broad individual and state rights viewed the right

---

[12] The *Heller* Court seemed to afford the Massachusetts proposal similar respect. 554 U.S. at 604.

to possess and carry arms as limited—particularly from those who had committed crimes or were a danger to the public." *Id*. Additionally, it is not surprising that exceptions to the Second Amendment would not have necessarily been added to state constitutions even if all delegates at a given convention agreed that they reflected the law of the land. After all, the fact that there are unwritten aspects of the Second Amendment is why *Bruen* requires courts to perform a historical analysis rather than exclusively rely on the text of the Amendment.[13] In sum, the court finds that English and American "dangerousness" laws are a historical analogous to § 922(g)(8).

### 2. Restrictions on "Going Armed"

The Government also argues that England and several American colonies enacted laws against "going armed" that are materially similar to § 922(g)(8). It contends that these laws, like the "dangerousness" laws, permitted law enforcement to seize weapons from members the community deemed dangerous. In pre-Revolution England, "the act of 'going armed to terrify the King's subjects' was 'a great offence at the common law,'" so long as it was committed with "evil intent or malice." Sir John Knight's Case, 87 Eng. Rep. 75, 76 (K.B. 1686). And in the United States, at least five colonies codified the common-law prohibition on going armed offensively in a threatening manner. *See* 1 Acts and Resolves, Public and Private, of the Province of the Massachusetts Bay, 52-53 (1869) (1692 law); Acts and Laws of His Majesty's Province of New-Hampshire: In New-England; with Sundry Acts of Parliament 17 (1771) (1701 law); 1 Laws of

---

[13] Brown also argues that the fact James Madison's original draft of the Second Amendment, which included a "conscientious-objector clause," was rejected at the Constitutional Convention means that any proposal to limit the Second Amendment to peaceable, law-abiding, or responsible citizens would also have been rejected. The court does not follow this logic. The Convention's decision to exclude a clause stating that "no person religiously scrupulous of bearing arms shall be compelled to render military service in person," has nothing to do with its views on the scope of the right to bear arms. Creating the Bill of Rights: The Documentary Record from the First Federal Congress 12 (H. Veit, K. Bowling, & C. Bickford eds.1991). This proposal speaks more directly to the issue of religious freedom.

23

the State of North-Carolina, including the Titles of Such Statutes and Parts of Statutes of Great Britain as Are in Force in Said State 131-32 (1821) (1741 law); Collection of All Such Acts of the General Assembly of Virginia, of a Public and Permanent Nature, as Are Now in Force 33 (1794) (1786 law); A Compilation of the Statutes of Tennessee of a General and Permanent Nature, from the Commencement of the Government to the Present Time 99-100 (1836) (1801 law).

But there are problems with analogizing "going armed" laws to § 922(g)(8). As an initial matter, unlike the "dangerousness" laws, the going armed laws targeted individuals who were actively bearing arms "in a way that spread[] 'fear' or 'terror' among the people." *Bruen*, 142 S. Ct. at 2145. The important distinction arising from this provision is that going armed laws only regulated those who were *using their weapons* to create chaos. This means that the going armed laws were backward looking rather than forward looking. Additionally, as the *Rahimi* court points out, at least three states with "going armed" statutes either did not provide for forfeiture of weapons in their statute or amended their statute to remove forfeiture provisions. 61 F.4th at 458. Moreover, the going armed statutes seemed to only disarm individuals after a criminal proceeding. *Id*. at 459. They did not apply to those who merely faced a civil hearing. *Id*. In brief, the court is not convinced that the "going armed" laws are suitable analogues for § 922(g)(8).

### 3. Surety Laws

Finally, the Government presents surety laws as materially similar to § 922(g)(8). These laws allowed "any private man [who] hath just cause to fear, that another will burn his house, or do him a corporal injury, by killing, imprisoning, or beating him" to "demand surety of the peace against such person." 4 Blackstone, Commentaries *252. The provision of a surety bond "was intended merely for prevention, without any crime actually committed by the party; but arising only from probable suspicion, that some crime [wa]s intended or likely to happen." *Id*. at 249. If the party of whom surety was demanded refused to post surety, he was prohibited from carrying a

24

weapon in public absent special need. *See Bruen*, 142 S. Ct. at 2148-49 (discussing operation of historical surety laws). This was "[o]ne means of conserving the peace, apart from prosecuting those who breached it." C. Kevin Marshall, *Why Can't Martha Stewart Have A Gun?*, 32 Harv. J.L. & Pub. Pol'y 695, 717 (2009). Many states and colonies enacted surety laws by statute around the time of the Founding or in the years immediately following.[14]

There are obvious similarities between § 922(g)(8) and surety laws that even *Rahimi* recognizes. 61 F.4th at 459 ("The surety laws come closer to being 'relevantly similar' to § 922(g)(8) than the 'dangerousness' and 'going armed' laws . . . ."). First, the *why* animating surety laws closely aligns with that of § 922(g)(8). Like § 922(g)(8), surety laws were intended to protect specific individuals from potential harm posed by another specific individual. Second, the methods of regulation employed by surety laws resemble *how* § 922(g)(8) works. Specifically, surety laws were not enforceable merely after a criminal conviction or charge. These laws "required only a civil proceeding, not a criminal conviction," in order to deprive an individual of their gun rights. *Rahimi*, 61 F. 4th at 460. This is identical to § 922(g)(8). Indeed, a court could require the posting of surety on nothing more than the "complaint of any person having reasonable cause to fear an injury, or breach of the peace." *See, e.g.*, Mass. Rev. Stat., ch. 134, § 16. At first glance, surety

---

[14] *See e.g.*, 1 Acts and Resolves, Public and Private, of the Province of the Massachusetts Bay, 52-53 (1869) (1692 statute); Acts and Laws of His Majesty's Province of New-Hampshire: In New-England; with Sundry Acts of Parliament, 17 (1771) (1701 statute); 2 Statutes at Large of Pennsylvania from 1682 to 1801, 23 (1896) (1700 statute); 1 Laws of the State of Delaware from the Fourteenth Day of October, One Thousand Seven Hundred, to the Eighteenth Day of August, One Thousand Seven Hundred and Ninety-Seven, 52 (1797) (1700 statute); Acts and Laws of His Majesties Colony of Connecticut in New-England 91 (1901) (1702 statute); *see also Bruen*, 142 S. Ct. at 2148 (stating that at least ten jurisdictions enacted surety laws between 1836 and 1871).

It is worth noting that Brown argues that surety statutes only proliferated in "the mid-19th century," after the time period relevant to an originalist Second Amendment analysis. ECF No. 49 at 7 (quoting *Bruen*, 142 S. Ct. at 2148). As is obvious from the list of statutes above, this point is unconvincing. These laws were on the books in several states during and prior to the Founding.

laws provide both the *why* and *how* required to convince the court that they are analogous to §
922(g)(8).

But Brown contends that surety laws and § 922(g)(8) are actually quite dissimilar because
the methods used by surety laws to protect at-risk individuals were less burdensome than those
employed by the regulation presently at issue. Unlike § 922(g)(8), surety laws only restricted
individuals from *publicly* carrying weapons, required the posting of a bond instead of banning
possession with criminal penalties,[15] and contained an exception allowing the carrying of firearms
in exceptional cases of self-defense.[16] The court, however, is not troubled by the fact that there is

---

[15] In supplemental briefing, the Government cites an influential 1829 treatise by William Rawle
for the proposition that "if an individual with a surety order against [him] was found in possession
of a firearm, in violation of the surety order, that individual would be subject to imprisonment."
ECF No. 58 at 3 (citing William Rawle, A View of the Constitution of the United States of America
126 (2d ed. 1829). This summation of law is based on a passage stating that

> [a]n assemblage of persons with arms for an unlawful purpose, is an indictable
> offence, and even the carrying of arms abroad by a single individual, attended with
> circumstances giving just reason to fear that he purposes to make an unlawful use
> of them, would be sufficient cause to require him to give surety of the peace[.] *If he
> refused he would be liable to imprisonment*.

Rawle at 126 (emphasis added). The treatise does not mean exactly what the Government asserts.
Rather than showing that an individual could be arrested *for possessing a firearm* in *all* cases where
a surety order has been issued, the passage merely states that an individual could be arrested for
*refusing to post* surety. Rawle does not indicate what might occur if an individual who had posted
surety was found in possession of a firearm in public. All evidence this court has reviewed
indicates that authorities would have simply compelled the possessor to forfeit the posted bond.
None of the statutes cited above contain language indicating that Governments were ever granted
the power to hold a firearm possessor who had posted surety criminally liable for gun possession.
*See* footnote 14; *see also Bruen*, 142 S. Ct. at 2148-49 (discussing the limited scope of surety laws
further).

[16] Additionally, Brown argues that surety laws are no analogue for § 922(g)(8) because they did
not apply nationally, unlike the federal law currently at issue. But Brown cites no case law bearing
on whether the national vs. state distinction has any significance under *Bruen*.

He also points out that surety laws often established that their restrictions could not exceed six
months, yet § 922(g)(8)'s restrictions can be permanent. Brown's assertion is missing information.
Although many surety laws included time limits, at common law a justice of the peace could
require a person to give sureties "for life." Marshall, 32 Harv. J.L. & Pub. Pol'y at 718 (quoting 1
Hawkins, Pleas of the Crown 129). Moreover, § 922(g)(8) restricts an individual's right to possess

not perfect alignment between these comparable regulations. *See Bruen*, 142 S. Ct. at 2118 (holding that the court need not find a historic law that is a "dead ringer" for the challenged regulation). There are sufficient similarities between § 922(g)(8) and surety laws to find that they are analogous. For instance, while the *methods* of § 922(g)(8) and surety laws are not the same, the reason *why* these laws deprive individuals of their arms is almost identical. Both sets of regulations were intended to prospectively protect at-risk individuals from impending harm.

Moreover, the court cannot examine surety laws in a vacuum when attempting to sus out the contours of the Nation's traditions. Laws banning possession based on "dangerousness" inform us that governments routinely and fully deprived dangerous individuals of their Second Amendment rights with minimal due process. Thus, it is clear that governments can traditionally employ powerful methods for protecting the populace from dangerous individuals—the *how* in the *Bruen* analysis. When the *how* of "dangerousness" laws and the *why* of surety laws are paired together, the court is convinced that § 922(g)(8) does not go beyond this Nation's historical limits on firearm regulation.

In sum, the analogues presented by the Government reflect that Americans have a right to keep and bear arms that can be prospectively burdened with a showing that a person poses a risk of danger to the community or an individual. § 922(g)(8) fits into this tradition. As then-Judge Barrett stated in *Kanter*, "[h]istory is consistent with common sense: it demonstrates that legislatures have the power to prohibit dangerous people from possessing guns." 919 F.3d at 451.

---

firearms only while they are subject to the underlying protective order. In Utah, protective orders "automatically expire[] three years after the day on which the cohabitant abuse protective order is entered." Utah Code Ann. § 78B-7-606(1).

## CONCLUSION & ORDER

For the reasons articulated above, the court concludes that § 922(g)(8) is not facially unconstitutional. Thus, the court DENIES Brown's motion to dismiss. By filing this motion, Defendant has preserved this issue for a future post-conviction appeal in the event the Supreme Court resolves this unsettled area of law in his favor.

DATED July 26, 2023

BY THE COURT

Jill N. Parrish
United States District Court Judge